## THE FIRST NATIONAL BANK OF HAVRE DE GRACE *vs.* SCOTT A. WHITE.

*Mechanics' Lien—Contract for Work on a Building Held to Have Been Made With the Owner of the Building and Not With the General Contractor.*

Upon a bill to enforce a mechanics' lien against a building for putting on it a tile roof, the claimant alleged that the owner and architect had ordered the work from him and promised to pay for it, while the owner of the building alleged that it had been ordered by the contractor, and that the contract for the roof had been made by the lien claimant with the contractor, and that since the claimant had not given to the owner the notice of his intention to claim the lien required by statute, the same was not enforceable against the building. *Held,* upon an examination of the evidence, that the claimant had made the contract for doing the work directly with the owner and not with the general contractor, and that consequently his claim is enforceable.

*Decided January 11th, 1911.*

Appeal from the Circuit Court for Harford County (VAN BIBBER, J.).

The cause was argued before BOYD, C. J., PEARCE, SCHMUCKER, BURKE, PATTISON and URNER, JJ.

*S. A. Williams* and *P. H. Close,* for the appellant.

*William H. Harlan,* for the appellee.

PATTISON, J., delivered the opinion of the Court.

The appellee in this case was in the years 1905 and 1906 a resident of Pittsburg, Pa., and was, as he expresses it, in the business of "roofing and terra cotta work." Between the 8th day of November, 1905, and the 18th day of January, 1906, he furnished labor and material in the construction of a bank building at that time being erected upon a lot of land in Havre de Grace, Harford County, Md., owned by the appellant; for which labor and materials so furnished he was to be paid the sum of $727.00. It not being paid, he, on the 13th day of July, 1906, filed a mechanics' lien therefor, with interest thereon from the 18th day of January, 1906, against the bank building and the lot on which the same was erected. Others who had also furnished labor and material in the construction of this building, likewise filed mechanics' liens. Among them was one Abram M. Zimmers, who, on the 15th day of October, 1906, filed his bill of complaint asking that a decree be passed for the sale of the property, against which such liens had been filed, and that the proceeds therefrom be distributed among the lienors, as far as they were entitled thereto.

In the bill so filed, in which the appellant and the lienors, including the appellee, were made parties defendant thereto, he alleged, among other things, that the John A. Sheridan Company was the contractor and builder of the said bank building, and that the appellant was the owner of said building and the grounds upon which it was erected. It also alleged the filing of the liens of the appellee and others against said property.

The appellant answered admitting that it was the owner of the building and the grounds upon which it was erected, and in respect to the appellee's claim admitted that it had been filed, as stated, but denied that his claim was due as alleged, or that it was a valid and subsisting lien against the property of the appellant.

The appellee thereafter filed his answer to the bill, alleging, among other things, that the contract for the furnishing of the labor and materials, mentioned in his lien, was made with the appellant, and that he had at the time "no knowledge of any general contractor on the work and did not deal with any general contractor, but dealt directly with the said bank through its agents," ' and that not until a long while after the contract had been made was he notified that the John A. Sheridan Company was the contractor and builder of said bank building. In his answer he also alleges that the material was furnished and the work done as stated in the lien, and that the whole amount to be paid therefor, together with the interest thereon, was still owing to him.

Evidence was taken both for and against the recognition of this claim as a lien upon the property of the appellant mentioned therein, and upon submission of this evidence to the Court below the lien was sustained. It is from this order sustaining the lien that this appeal is taken.

The sole question in this case is, with whom was the contract made and to whom was credit given by the appellee for the materials furnished and work done by him in the construction of the building; that is to say, was the contract made with and credit given to the appellant, the owner of the building and the grounds upon which it was erected, or was the contract made with and credit given to the contractor and builder thereof, the John A. Sheridan Company? If it should be found that the contract was made with and credit given to the contractor and not with and to the owner of the building, then the lien is defective, because of the want of the notice required under the statute to be given by the appellee to the owner of the building and the grounds upon which it was erected, of his intention to claim a lien on the property for the work and materials furnished. If, however, it should be found that the contract was made with and credit given to the owner of the building, the appellant, then the lien should be sustained.

The appellee testified that the first information he had as to the erection of this bank was communicated to him by a letter from R. T. Cropper, of Philadelphia, agent of the Akron Roofing Tile Company, of which company he was also a representative, though in a different territory. In this letter, dated October 25th, he was requested to make an estimate on the tile roofing for this building. This he did, and a short while thereafter forwarded the same both by wire and mail, and in reply thereto was notified by Cropper that the contract had been awarded to him and for him to proceed with the work. Upon receipt of this notice the order was at once sent to the factory. He further stated that after this he was in Philadelphia and there he met Mr. Plack, architect, and Mr. Vanneman, cashier of the appellant bank. The exact date of this visit he could not recall, but it will be seen by his letter to the John A. Sheridan Company of November 11th, 1905, offered in evidence, and the letter of Cropper to White, dated November 13th, 1905, and by other evidence appearing in the record, that the date of his visit to Philadelphia on the occasion referred to was Tuesday, November 7th, 1905. He testified that upon this occasion, after discussing other questions in relation to the shipment of tile, etc., "Mr. Plack said he wanted us to make a contract with and send the bill to the John A. Sheridan Company. They stated their reason for this was they wanted to keep their accounts here with Mr. Sheridan. From the fact that Mr. Cropper told me that he had bid with one or two other metal roofers I supposed that the John A. Sheridan Company was a metal roofer. I stated that I was willing to make a contract with or send the bill to anyone they chose if they would agree to be responsible for the payment of the money to us. Mr. Plack turned to Mr. Vanneman and put the question to him and Mr. Vanneman consented to be responsible for the payment of the money. I did not know until quite a time after we had finished our work that the John A. Sheridan Company was a general contractor.

So that my position in this case was that we were dealing entirely with the bank through Mr. Plack and Mr. Vanneman, and that we would be paid by them; that they would hold the money back from the tin roofer, as I thought at the time. The fact of our sending the bid to Sheridan for him to accept and sending the bill to Sheridan was to straighten out the account between the owner and Sheridan."

Mr. R. T. Cropper, of Philadelphia, testified that his business was that of "roofing tile and slate," and stated that in the latter part of 1905 he was at the office of Mr. Wm. L. Plack, architect, in the City of Philadelphia, and was told by him that he had a roof upon which he wished to use tiling, and suggested that he submit to him samples. Later he was told the location of the building, and thinking that it was not in his territory, but in the territory of the appellee, he wrote to him the letter referred to by the appellee in his testimony. In this letter he forwarded to him the blue print that had been furnished him by the architect, with a request that he submit an estimate, which was to include the application of the tile upon the roof. This estimate was received and accepted, and he was requested by Mr. Plack to instruct Mr. White to proceed with the work. He further testified, saying: "Later I visited the office, I think possibly in response to a 'phone call, and Mr. Vanneman (the cashier of the bank) was present, when he adopted certain patterns of tile which practically had been accepted before, but with the further approval of Mr. Vanneman." That the kind and quality so selected by Mr. Vanneman were those that were placed upon the roof by Mr. White, the appellee, and that in making this contract witness dealt with no one except Mr. Plack and Mr. Vanneman; that he "never heard of the John A. Sheridan Company until the work had progressed quite some little, possibly after they had been working then a couple of days or more. The work was in progress anyway." That he never saw John A. Sheridan in his life.

William L. Plack, architect, upon being called to the stand
by the appellant, testified that the appellee furnished the
material and did the work mentioned in his lien.  He re-
called the meeting of the appellee and Mr. Vanneman, the
cashier of the bank, in his office in Philadelphia; he could
not say whether this meeting was before or after the work
was done.  When asked what was said by either the witness
or Vanneman to White, or by White to either of them, he
replied by saying: "To the best of my knowledge, Mr. White
dropped in accidentally while Mr. Vanneman was there, and
Mr. White brought up the question of who was to pay for the
tiling or who was the party with whom he contracted, and I
told him he was a sub-contractor under the John A. Sheridan
Company of Baltimore.  He then wanted to know whether
the John A. Sheridan Company of Baltimore was responsi-
ble.  I knew very little about them and I thought they were
all right, and I said: 'Mr. Vanneman here can tell you all
about them.'  Mr. Vanneman then told him to the best of
his knowledge the John A. Sheridan Company was entirely
responsible; that they had big interests, were doing a great
deal of work."  Witness could not recall what was said in
reply thereto by Mr. White, but "he seemed to be satisfied
with Mr. Vanneman's explanation of the situation and I
heard nothing more about it.  The material was delivered."
That part of the testimony of White where he said "I stated
I was willing to make a contract with or send a bill to any-
one they chose if they would agree to be responsible for the
payment of the money to us," was repeated to witness, and
he was asked if anything of the kind was said in the inter-
view, to which he replied: "I don't know that they were the
*exact words* that Mr. Vanneman used, but I felt at the time
and I think that Scott White felt that the idea to be con-
veyed was that he should be protected in the payment of his
bill.  The whole gist of the conversation was Mr. Vanneman
acting in the capacity of cashier of the bank and I as archi-

tect of the bank, without detailing any personal responsibilities, talking in a general way upon the subject." Upon cross-examination, when asked: "Who solicited the bid from White for the roofing?" he said: "I went to Mr. Cropper's place, at Builders' Exchange on S. 7th St., was very favorably impressed with the material he had on exhibition, and when Mr. Vanneman next came to the city I took him down and we looked them over. He was also favorably impressed and we made a selection and notified Sheridan." That after the selection was made by witness and Vanneman and notice thereof given to Sheridan he, Sheridan, gave the order to White for the roofing. He was then asked: "Then Mr. White was in error when he stated that you awarded him the contract on the estimate sent by him to Cropper and by Cropper handed to you? A. If I had authority from Sheridan I may have ordered it, but I do not recall; if I did order it it was as Sheridan's agent. Q. Did you order it as Sheridan's agent? A. I can't recall now, sir; I can't tell you, but if I did it was by letter authorizing me to do so. Q. But do you claim to have disclosed to Mr. White or Mr. Cropper that you were ordering this stuff as the agent of the John A. Sheridan Company? A. Yes; because I told them they were sub-contractors under Sheridan; that is implied. Q. But the interview between you, Mr. White and Mr. Vanneman took place after the contract had been awarded? A. Evidently. Q. Now, who awarded the contract? A. The John A. Sheridan Company awarded the contract."

Mr. Vanneman, the cashier of the bank, was then placed upon the stand, and testified that he was in Mr. Plack's office one day and was just going out as Mr. White came in the door. He was then asked: "Please state your recollection of what was said by each one of you at that interview? A. I have very little recollection of much being said, except Mr. Plack's hurrying him up and I forget what reason he gave for the delay; there was some delay at the factory, though, I think; as far as any question from him as to who would be

responsible, I do not think any such question was asked.
Q. Was anything said there about the responsibility of John
A. Sheridan Company? A. They probably asked me as to
whether the John A. Sheridan Company was responsible; I
told them I thought they were; they were putting up large
buildings in Baltimore and I had no idea but what they
were in first-class condition." He was then asked if it were
true, as testified to by Mr. White, that he had stated that he
was willing to make a contract with or send the bill to any-
one they chose if they would agree to be responsible for the
payment to him of the money; to which he replied that it
was not true; that he never assumed on his own part or on
the part of the bank any responsibility for the payment of
the debt. He then testified that the John A. Sheridan Com-
pany made the contract; that he had nothing to do with it,
and then further said: "I went with Mr. Plack to Mr. Crop-
per's office at his suggestion to see the different styles of tile
and what they thought would be best for that roof. We saw
the kind we thought would look best and Mr. Plack approved
of it as the architect, and I told Mr. Cropper right there
that we had nothing to do with the ordering of it; that the
order had to come from the Sheridan Company." He fur-
ther testified that he was a stockholder in the John A. Sheri-
dan Company to the extent of one thousand dollars, the entire
capital stock being twenty-five thousand dollars.

There are in the record as evidence a number of letters
and telegrams from and to the various parties connected with
this transaction. We find first a letter of the date of Octo-
ber 25th, from Cropper to White, in which he said that he
was, under separate cover, sending him plans upon which
he wished him to make an estimate for tile roofing for the
bank building at Havre de Grace, Md. In this letter he said
"the architect had his client here yesterday and I told him
that I would have him a bid from a man who could lay a job
in a workmanlike manner and that he would not have a
leaky roof." This letter does not disclose the name of the

client referred to, but it could not have been the John A. Sheridan Company, for Cropper in his testimony has said that he "never heard of the John A. Sheridan Company until the work had progressed some little, possibly after they had been working then a couple of days or more," and that he never saw John A. Sheridan in his life. Therefore, we can assume that the client referred to must have been someone connected with the appellant. In this letter he directed White to send his bid to W. L. Plack, architect, 1208 Chestnut street, Philadelphia. A letter from Cropper to White, dated October 30th, shows that he had not at that time heard from him, as in this letter the writer said: "I am awaiting the arrival of blue prints and your bid on the Havre de Grace bank." But by letter of November 11th, 1905, from White to the Sheridan Company, it is shown that the bid or estimate was forwarded by White to Architect Plack by letter of October 31st, for in the letter of that date he refers to his bid sent to Plack, the architect.

In a letter from the John A. Sheridan Company dated November 8th, the writer said: "Your letter of October 31st received and contents noted for the roof tile at the Havre de Grace bank. *This was ordered by the architect* and I hereby accept the same for $727, all complete down to the gutter, as per plans and specifications drawn by Mr. W. L. Plack." By letter of the same date to the Sheridan Company White acknowledges the receipt of the aforesaid letter of the Sheridan Company accepting his bid, and states in this letter, "The materials (tarred felt, tin and nails) have already been shipped, the tile will follow shortly," etc.

A letter from White to the Sheridan Company, dated November 11th, aids in establishing the date of the meeting of the appellee and Vanneman at the office of Plack in Philadelphia as being on November 7th, 1905, for in it he says: "I saw Mr. Plack in Philadelphia on last Tuesday (the 11th of November, 1905, came on Saturday, consequently the preceding Tuesday was the 7th), and it will be recalled that

in the evidence there is no testimony that the appellee met Mr. Plack in Philadelphia in relation to this matter on any other occasion than the one referred to, in which the alleged conversation took place.   In fixing this time we are also somewhat aided by the letter from Cropper to White, dated November 13th, in which he says: "Proceed at once with the architect's interpretation on Tuesday last."   It was, therefore, on the day following the meeting in Philadelphia that the John A. Sheridan Company in its letter of November 8th, accepted the bid of the appellee to furnish material and do the work on the building for $727, and at a time after the order had been given and some of the materials furnished thereon.   Therefore, it is not an unreasonable inference that this letter was written by the Sheridan Company when informed by either Plack or Vanneman of the conversation between the appellee and Vanneman on the previous day, in which they had suggested that the appellee should "make a contract with and send the bill to the John A. Sheridan Company," and was done in part execution of the plan so suggested.

It seems that in the letter from the John A. Sheridan Company to White, dated November 8th, the expression therein used, "all complete down to the gutter, as per plans and specifications drawn by Mr. Plack," gave rise to some disagreement or misunderstanding, for in the letter from White to the Sheridan Company dated November 9th, 1905, the writer refers to this expression and says: "Please note that our estimate does NOT include any metal work, valleys," etc.   To this lettter the Sheridan Company replied on November 10th, saying therein, "Mr. Plack and Mr. Vanneman told me that *they were going to arrange with you to put this roof on for the same price as I had for my man,* everything included except skylight, down to gutter."

The language in this letter italicised goes far to sustain the contention of the appellee and to show that the position assumed by Plack and Vanneman in relation to the procur-

ing of this estimate and the furnishing of the labor and material, was independent of the alleged contractor.

It is true that in two letters from White to the Sheridan Company, one dated March 8th, 1906, and the other dated April 8th, 1906, the Sheridan Company is asked to pay this claim, but this fact in itself does not show that the contract was made with the contractor and credit given to him, but is only a circumstance to be submitted with all the other evidence in the case. *Elder* v. *Warfield*, 7 H. & J. 391; *Meyer and Ewaldt* v. *Grafflin*, 31 Md. 357.

In the last letter of the correspondence between White and Vanneman—a letter from Vanneman to White—dated July 15th, 1906, the writer acknowledges White's favor of the 8th and said he had been endeavoring to have an interview with Sheridan in relation to the appellee's account, and thereafter in his letter said: "I presume you are aware that the John A. Sheridan Company has made an assignment and I do not know as yet what the outcome will be, but I want very much to see your account settled. I would suggest that you write at once to Mr. S. A. Williams, attorney at law, Harford Co., Md., to take steps to lay a lien on our building on your claim. When this is done legally to protect us, you can assign the claim to us and we will pay the bill." At this date it was too late to give the notice required by the statute to be given by the appellee to the owner of the building if the contractor was to be treated as the party with whom the contract was made and to whom credit was given. From this letter it can be reasonably inferred that at the time it was written there had been no settlement between the bank and the contractor, for they promised to pay the bill when the claim was filed legally to protect them, which promise it is not probable they would have made had they fully settled with the contractor. As suggested by Mr. Vanneman, the appellee filed his lien on the 13th day of July, 1906, less than thirty days after receipt of this letter.

As the question in this case is largely one of fact, we have set out very fully the evidence appearing in the record, and while there is a conflict therein, we think the weight of it sustains the contention of the appellee that the contract for the furnishing of this labor and material was made by the appellee with the appellant, the owner of the building, for which the work and materials were furnished in its construction, and that the credit was given originally to the bank and not to the contractor. In reaching this conclusion we regard the acceptance by the contractor of the appellee's bid or estimate, as shown by his letter of November 8th, under the circumstances of the case, as more of a confirmation by him, as contractor, of the contract previously made with the appellant, which acceptance was suggested by the appellant and was agreed upon and consented to by the appellee for the purposes stated in the testimony and as a matter of favor and convenience to the appellant. We will therefore affirm the order of the learned Court below.

*Order affirmed, with costs to the appellee.*